**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARIO CERAME ET AL., | : | No. 3:21-cv-01502-AWT |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL BOWLER ET AL., | : | |
| *Defendants.* | : | DECEMBER 28, 2021 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

The Judges of the Connecticut Superior Court recently adopted Rule 8.4(7) of the Rules of Professional Conduct ("the Rule), which provides that it is misconduct for an attorney to engage in harassment or discrimination related to their practice of law. The Rule was the culmination of an extensive deliberative process, both in Connecticut and nationwide, and it received overwhelming support from numerous stakeholders, including the Connecticut Bar Association and law firms, law schools, and private attorneys. At the conclusion of that process the Judges voted unanimously to adopt the Rule, and in doing so took an important step to advance the State's compelling interests to ensure the integrity of the bar and the judicial process and to eliminate discrimination and harassment in the legal profession.

In advancing those important state interests the Judges were respectful— indeed, accommodating—of attorneys' right to free speech. The commentary to the Rule expressly provides that the Rule does not apply to speech protected under both the First Amendment and the Connecticut constitution. Separate and apart from that protection, moreover, the procedures through which grievances are resolved

1

independently require both the Statewide Grievance Committee and the state courts to dismiss a grievance if imposing discipline under the Rule would violate an attorney's constitutional rights.  And because the state judicial process requires those determinations to be made in concrete grievances based on actual facts and evidence, the state courts exercising jurisdiction over disciplinary matters are best situated to identify, assess and protect any First Amendment interests that may be implicated by a particular grievance.  The state courts take this duty seriously, and there is no reason to believe they cannot adequately perform their judicial function consistent with the Rule and the state and federal constitutions.

Despite those protections, Plaintiffs ask this Court to intrude on the State's sovereign function to regulate the legal profession and to declare the Rule facially unconstitutional.  Plaintiffs make that request before the Rule has even gone into effect or been applied to any attorney.  By definition, Plaintiffs' pre-enforcement facial challenge is not based on the kind of concrete facts that would be presented in a properly filed grievance, but on abstract and hypothetical scenarios that Plaintiffs believe are both protected First Amendment activity and subject to the Rule.  But that is a legal impossibility: an attorney's actions can be *either* protected by the First Amendment *or* within the scope of the Rule, but not both.  And it is for the state courts to determine which of the two it is in each individual case based on concrete facts and evidence that illustrate the precise contours of the claimed First Amendment interests at issue.

In reality, then, this case is not a facial First Amendment challenge to the Rule in any meaningful sense, since neither the Rule nor Connecticut's grievance procedures permit an attorney to be disciplined for engaging in constitutionally protected speech. Instead, the case is an improper request for this Court to usurp the state courts' judicial function to protect constitutional rights in grievances pending before them and to preemptively obtain an advisory opinion about whether hypothetical conduct not before the Court is protected by the First Amendment such that it does not fall within the scope of the Rule. Several conclusions flow from this, all of which require dismissal.

First, the Eleventh Amendment bars this suit in its entirety. Because the Rule does not proscribe constitutionally protected speech, the Rule's mere existence cannot be an ongoing violation of federal law for purposes of *Ex Parte Young*. The only way such a violation could occur is if the Statewide Grievance Committee and the state courts fail to heed the Rule's commentary and their obligations under both the grievance procedures and the state and federal constitutions and discipline an attorney for engaging in protected speech. It would be an afront to the State's sovereignty and basic principles of federalism for this Court to assume that the state judiciary either cannot or will not follow the Rule and the constitution in that way, to usurp the judiciary's function to assess and protect any First Amendment interests in grievances pending before them, and to facially invalidate a duly enacted Rule of Professional Conduct based on hypothetical speech that expressly is excluded from the scope of the Rule.

Second, even if Plaintiffs had alleged an ongoing violation of federal law, the Supreme Court's recent decision in *Whole Woman's Health v. Jackson*, No. 21-463, 2021 U.S. LEXIS 6144 (Dec. 10, 2021) makes clear that Defendants are not proper parties for purposes of either *Ex Parte Young* or Article III. That is because Defendants are not "adverse" to an attorney and do not "enforce" state laws in the way that administrative agencies do. They instead act as an arm of the Superior Court and perform an exclusively judicial function to interpret and apply the Rules of Professional Conduct to resolve disputes between a complainant and an attorney. *Ex Parte Young* does not permit pre-enforcement "injunctive relief against a state court" or its "machinery," and Plaintiffs' proper recourse is therefore to raise any First Amendment concerns they might have as a defense in an as-applied grievance proceeding, if one ever arises. *Whole Woman's Health*, 2021 U.S. LEXIS 6144 at *15.

Third, and relatedly, Plaintiffs cannot establish standing. Their claimed injury boils down to nothing more than their subjective fear that they will be disciplined for engaging in protected speech that expressly is excluded from the scope of the Rule. Not only is there no realistic chance of that injury occurring, any chance that it will occur depends on a string of speculative actions by independent third parties that have not happened and likely never will. That includes decisions by several disciplinary authorities and state courts to ignore their obligation to dismiss a grievance if it is based on protected speech. Any purported "chill" that Plaintiffs may perceive based on those speculative and decidedly unlikely actions plainly is not enough to establish Article III standing.

## FACTUAL BACKGROUND

### A.    Connecticut's Adoption Of Rule 8.4(7)

The Rule has its genesis in the American Bar Association's Model Rule 8.4(g), which the ABA adopted in 2016.  In the ensuing five years, numerous states have adopted Model Rule 8.4(g) or some variation of it, and several other states currently are considering adoption.  That includes both New York and Vermont, Connecticut's sister states in the Second Circuit.

Perceiving a problem of harassment and discrimination within Connecticut's own legal profession, two lawyers proposed the Model Rule to the Rules Committee of the Superior Court, which tabled the proposal and instructed the proponents to coordinate with the Connecticut Bar Association ("CBA") to develop a new proposal. The CBA engaged in an extensive investigative and deliberative process to determine the nature and severity of the problem and the best ways to address it, including a comprehensive survey of attorneys' experiences with discrimination and harassment in their legal practice.  The result was the current version of the Rule, which the CBA proposed and the Judges of the Superior Court collectively—and unanimously— adopted at their meeting held in June 2021.  *See generally* Compl., ¶¶ 30-39.

The adopted changes amended Rule 8.4 of Rules of Professional Conduct to add subsection (7), which now provides that:

> It is professional misconduct for a lawyer to: . . . (7) engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of race, color, ancestry, sex, pregnancy, religion, national origin, ethnicity, disability, status as a veteran, age, sexual orientation, gender identity, gender expression or marital status in conduct related to the practice of law.  This paragraph does not limit

the ability of the lawyer to accept, decline or withdraw from a representation, or to provide advice, assistance or advocacy consistent with these Rules.

In addition to those changes to the text, the Judges unanimously adopted new commentary to explain the Rule's intended meaning and scope. Although "the text of each [r]ule is authoritative" and the commentaries cannot conflict with it, the Connecticut Supreme Court has made clear that the commentary "explains and illustrates the meaning and purpose of the [r]ule" and that the Rule therefore "must be read together with its [c]ommentary in order for it to be fully and properly understood." *Cohen v. Statewide Griev. Comm.*, 339 Conn. 503, 514 (2021). For purposes of this motion, three aspects of the commentary inform how the Rule should be interpreted and applied.

First, the commentary explains that the term "discrimination" is intended to cover verbal or physical "conduct" that is "directed at an individual" and "harmful" to that individual. Compl., ¶ 41. Similarly, the term "harassment" commonly is understood to mean conduct directed to a particular person,[1] and the commentary explains that such conduct must be "severe or pervasive" and "derogatory or demeaning" to constitute a violation. *Id.*, ¶ 41. The Rule therefore does not proscribe "offensive speech" in the abstract. It instead addresses the specific vice of "conduct" that is directed at specific individuals and causes those individuals harm. *See infra* at 30 n.5 (discussing difference between conduct and speech).

---

[1]     Merriam Webster, https://www.merriam-webster.com/dictionary/harass (last visited December 6, 2021) (describing the essential meaning of harass as "to annoy or bother (someone) in a constant or repeated way").

Second, the commentary provides that "[n]ot all conduct that involves consideration of" the protected categories will constitute discrimination or harassment, and that conduct implicating those categories will fall outside of the Rule if "there [is] a legitimate nondiscriminatory basis for the conduct." *Id.* Thus, simply alleging that a person wishes to engage in conduct that "affects" one or more of the protected categories will not, without more, violate the Rule. *See id.*, ¶ 51.

Third, and most importantly for purposes of this motion, the commentary expressly provides that "[a] lawyer's conduct does not violate paragraph (7) when the conduct in question is protected under the first amendment to the United States constitution or article first, § 4 of the Connecticut constitution." *Id.*, ¶ 41. This unambiguous guidance, which the Judges deliberately put into the commentary, reflects their clear intent that Rule 8.4(7) does not apply to speech that is constitutionally protected, that discipline cannot be imposed under the Rule based on such speech, and that the disciplinary authorities and state courts exercising jurisdiction over disciplinary matters should not and cannot permit grievances to proceed under the Rule to the extent they are based on such speech.

## B.    Connecticut's Disciplinary Process

Under Connecticut law, the regulation and discipline of attorneys is exclusively a judicial function performed by the Judges of the Superior Court, who have "inherent authority to regulate attorney conduct and to discipline members of the bar." *Statewide Grievance Comm. v. Presnick*, 215 Conn. 162, 166 (1990). The Judges have delegated portions of this judicial function to the Statewide Grievance

Committee ("SGC") and other disciplinary authorities, who "act as an arm of the court" when exercising their duties.  *Presnick*, 215 Conn. at 167; *Sobocinski v. Statewide Grievance Com.*, 215 Conn. 517, 526 (1990).  The SGC is thus "a judicial entity," and any proceedings before it are tantamount to "judicial proceedings" of the state courts themselves.  *Chester v. Willey*, No. 374862, 1991 Conn. Super. LEXIS 1409, at *5-6 (Super. Ct. June 7, 1991).

Exercising this exclusive and inherent authority, the Judges have adopted a comprehensive process for resolving complaints of attorney misconduct, including grievances based on Rule 8.4(7).  *See* Conn. Prac. Bk. §§ 2-29 *et seq.*  Like the Rule itself, that process is full of procedural safeguards to ensure that attorneys' First Amendment rights are protected.

Specifically, when Defendants[2] receive a complaint, they conduct an initial review and must dismiss the complaint if it fails to state a claim.  *Id.*, § 2-32(a)(2)(B).  If it is clear from the face of the complaint that a grievance is based on constitutionally protected speech, therefore, Defendants must dismiss a complaint under Rule 8.4(7) at that threshold review without requiring the attorney to even file a response.

If it is not clear from the face of the complaint that it fails to state a claim, Defendant Bowler must refer the matter to a local grievance panel to investigate the complaint and determine whether there is probable cause that the attorney engaged in misconduct.  *Id.*, § 2-32(b), (f).  This preliminary investigation before the grievance

---

[2]      Defendants are the Statewide Bar Counsel and the Chairman of the Statewide Grievance Committee.

8

panel is confidential.  *Id.*, § 2-32(g).  The attorney then has an opportunity to file an initial response, which can include a hearing and legal argument.  *Id.*, § 2-32(h).  If the complaint implicates Rule 8.4(7), that response could include evidence and argument about the nature of the alleged conduct and why the attorney believes it is constitutionally protected speech.  If the conduct is constitutionally protected and therefore not within the scope of the Rule, the grievance panel must dismiss the complaint for lack of probable cause.  *Id.*, § 2-32(i)(2).  Such a dismissal is with prejudice and not subject to appeal.  *Id.*

If the grievance panel finds there is probable cause that the attorney engaged in discrimination or harassment within the scope of the Rule, the panel must forward the complaint to the SGC, which typically assigns the complaint to a reviewing committee.  *Id.*, §§ 2-32(i)(1) and 2-35(a).  The reviewing committee must then "hold a hearing on the complaint."  *Id.*, § 2-35(c).  The attorney has the right to counsel, to be heard in his or her own defense, to present evidence, to examine and cross-examine witnesses, and to present legal argument.  *Id.*, § 2-35(h).  That could again include evidence and argument that the alleged conduct is protected by the First Amendment and therefore not within the scope of the Rule.  If that is the case, the reviewing committee likewise must dismiss the complaint.  *Id.*, § 2-35(i).

If the reviewing committee finds that the attorney engaged in misconduct within the scope of the Rule, the attorney then has a right to seek further review by the full SGC.  *Id.*, §§ 2-35(k) and 2-36.  Any sanctions imposed by the reviewing committee are automatically stayed during the pendency of such review.  *Id.*, § 2-

35(i).  Further, the practice book expressly provides that the SGC must review not only whether the attorney substantively violated the Rule, but also whether "the reviewing committee's findings, inferences, conclusions or decision is or are: (1) in violation of constitutional . . . provisions . . . ."  *Id.*, § 2-35(k)(1).  Thus, not only does the Rule itself affirmatively require the SGC to identify and protect First Amendment interests, so too do the grievance procedures.

In addition to all of these constitutional protections in proceedings before the SGC, attorney grievances ultimately are resolved by the state courts, which have inherent authority to discipline attorneys in matters pending before them and also hear *de novo* presentments and appeals from discipline the SGC may impose.  *Id.*, §§ 2-38(a) and 2-47.  As with a request for review before the full SGC, any sanctions imposed on an attorney are automatically stayed during the pendency of a court appeal.  *Id.*, § 2-38(b).  The attorney is again entitled to submit a brief and may present oral argument to the Superior Court upon request.  *Id.*, § 2-38(d) and (e).  And like the full SGC before it, the Superior Court has an obligation—under Rule 8.4(7), Practice Book § 2-38(f) and independently under the state and federal constitutions— to dismiss a grievance if the court determines that the attorney's alleged conduct is legally protected by the First Amendment.  If the attorney is not satisfied with the Superior Court's ruling, the attorney may seek further review by the Connecticut Appellate and Supreme Courts and, if necessary, the United States Supreme Court.  *Id.*, § 2-38(f).

### C.    Plaintiffs' Claims and Allegations

Completely ignoring these First Amendment protections in both the Rule and the grievance procedures, Plaintiffs brought this pre-enforcement facial challenge in which they ask this federal Court to usurp the state courts' judicial function discussed above and to preemptively invalidate the Rule before it has even gone into effect. Specifically, Plaintiffs claim that the Rule: (1) violates the First Amendment (Count 1); (2) is unconstitutionally vague in violation of the Fourteenth Amendment (Count 2); (3) violates Connecticut's free speech protections contained in Article I, section 4 of the Connecticut constitution; and (4) violates the separation of powers doctrine under Article III, section 1 of the Connecticut constitution. *See* Compl., ¶¶ 72-90.

As discussed more fully below, Plaintiffs' claims are not based on any concrete allegations about specific conduct these individual Plaintiffs personally wish to engage in. Nor are they based on any plausible allegation that a disciplinary action might be initiated against Plaintiffs for engaging in protected speech, much less that such an action would lead to discipline. The Complaint instead alleges nothing more than abstract and hypothetical conduct that Plaintiffs think some attorneys might engage in and that Plaintiffs subjectively believe the Rule would proscribe. For the reasons discussed below, those conclusory and speculative assertions do not even begin to establish this Court's jurisdiction.

## ARGUMENT

## I.   THE ELEVENTH AMENDMENT BARS THIS CASE IN ITS ENTIRETY

As much as Plaintiffs would like it to be, the constitutional question in this case is not whether the hypothetical speech that Plaintiffs abstractly identify in their Complaint is protected by the First Amendment. Nor is the question whether the Rule would apply to such activities to the extent they are constitutionally protected, as there is no question it would not. Rather, the only relevant constitutional question for this Court to decide is what forum, and in what procedural context, any potential First Amendment interests can and should be identified and protected. The Eleventh Amendment requires that determination to be made through the state judicial process that accounts for and affirmatively seeks to protect those interests.

### A.   *Ex Parte Young* Does Not Apply Because Plaintiffs Have Not Alleged An Ongoing Violation Of Federal Law, And Because Any Attempt By This Court To Preempt Hypothetical Future Violations Would Improperly Intrude On The State's Sovereignty And Deny The State And Its Judiciary The Dignity And Respect To Which They Are Entitled

It is well established that the States retained their status as independent sovereigns when they entered the Union. *Alden v. Maine*, 527 U.S. 706, 714 (1999). The Eleventh Amendment accords States the "dignity" and "respect" that comes with that sovereign status by providing them with a "broad" and "inviolable" immunity from suit in federal court. *Fed. Mar. Comm'n v. S. Carolina Ports Auth.*, 535 U.S. 743, 751, 760, 765 (2002); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268 (1997) (majority opinion); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). That immunity has its basis in principles of federalism and comity, and is premised

12

on the indignity that would result if one sovereign could be made to appear against its will in the courts of another. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984).

Although the protections afforded by the Eleventh Amendment are extensive, under *Ex Parte Young* the State's immunity may be overcome when the suit seeks prospective relief against state officials for ongoing violations of federal law. But the Supreme Court has reiterated time and again that *Ex Parte Young* is a "narrow exception" to the "broader" principle of sovereign immunity, and that it must be "narrowly construed" so that the Eleventh Amendment is not reduced to an "empty formalism." *Whole Woman's Health*, 2021 U.S. LEXIS 6144 at *15; *Pennhurst*, 465 U.S. at 98, 102, 114 n.25; *Seminole Tribe*, 517 U.S. at 76; *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256 (2011), quoting *Coeur d'Alene*, 521 U.S. at 270. In doing so, the Court has stressed that, although *Ex Parte Young* reflects a judicial effort to "harmonize" the Eleventh Amendment with the supremacy of federal law, it is not a vehicle by which federal courts may blindly subrogate the States' sovereignty. *Pennhurst*, 465 U.S. at 105; *Papasan v. Allain*, 478 U.S. 265, 277 (1986). To the contrary, "[a]pplication of the *Young* exception must reflect a proper understanding of its role in our federal system . . . ." *Coeur d'Alene*, 521 U.S. at 270 (majority opinion). That role is to allow federal courts to issue relief that is "tailored to conform ***as precisely as possible*** to those ***specific situations*** in which it is ***necessary***" for the vindication of federal law. *Papasan*, 478 U.S. at 277 (emphasis added; quotation marks omitted).

13

Given those principles that govern and define the doctrine, this case is a paradigm example of when *Ex Parte Young* should not apply. That is true for three reasons.

First, intervention by this federal court is not "necessary" to vindicate an "ongoing" violation of federal law, and it certainly is not necessary at this time. *Papasan*, 478 U.S. at 277. To the contrary, Plaintiffs have not alleged an existing or ongoing violation at all because the Rule simply does not apply to or proscribe constitutionally protected speech. The Rule's mere existence therefore cannot be the basis for invoking *Ex Parte Young*. The only way an actual and ongoing violation of federal law theoretically could occur is if the disciplinary authorities ***and*** the state courts both abdicate their obligations under the Rule, the applicable grievance procedures, and the state and federal constitutions by imposing discipline on an attorney for engaging in protected First Amendment activities that are outside the scope of the Rule. As discussed below, any such hypothetical future violation depends on a long string of speculative events that are decidedly unlikely to occur. *See infra* at 31-32. And unless and until they do, this Court's intervention plainly is not "necessary" to vindicate an "ongoing" violation of federal law.

Second, Plaintiffs do not seek relief that is "tailored to conform as precisely as possible to those specific situations" in which the Court's intervention theoretically might be necessary. *Papasan*, 478 U.S. at 277. They instead ask this Court to use the blunt instrument of a pre-enforcement facial challenge to permanently invalidate the Rule in ***all*** of its applications, including those that plainly would not violate the

14

First Amendment.  Worse yet, Plaintiffs ask the Court to issue that extraordinary relief based not on any "specific situations" before the Court, but on abstract hypotheticals that fail to define the precise nature of the conduct at issue or the specific contours of the First Amendment interests that conduct might present.  The Supreme Court repeatedly has held that such pre-enforcement facial relief is "strong medicine" that should be employed by a federal court only "sparingly" and "as a last resort."  *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).  That last resort surely is not at hand when no constitutional violation has yet occurred and when the state courts exercising jurisdiction over disciplinary matters are perfectly situated to ensure that it never does.

Third, even if Plaintiffs' request was appropriately tailored and concrete, this Court's intervention at this time, and in this manner, would intrude on the State's sovereignty in a way that *Ex Parte Young* does not permit.  It is a "foundational principle of our federal system" that "[s]tate courts are adequate forums for the vindication of federal rights."  *Burt v. Titlow*, 571 U.S. 12, 19 (2013).  Under our system of dual sovereignty, state courts have "inherent authority, and are thus ***presumptively competent***, to adjudicate claims arising under the laws of the United States," including "claimed violations of constitutional . . . rights."  *Id.* (emphasis added).  This is a "solemn responsibility" that the state courts share "equally with the federal courts," and the Supreme Court consistently "has refused to sanction any decision that would 'reflec[t] negatively upon [a] state court's ability to'" perform that judicial function.  *Id.*, quoting *Trainor* v. *Hernandez*, 431 U.S. 434, 443 (1977).

This principle alone is dispositive here.  As discussed throughout this brief, the Rule, the grievance procedures and the state and federal constitutions all place an affirmative obligation on both the SGC and the state courts to identify, assess and protect any First Amendment protected speech before discipline can be imposed under the Rule.  That is a task that is delegated to the state judiciary in the first instance, and they are obligated to perform it in every grievance they consider.  This Court is bound to assume that the state judiciary can and will perform this judicial function carefully and competently, and that they will protect the very same First Amendment rights that Plaintiffs ask this Court to address prophylactically.  For this Court to reach out and assume that state judicial function—especially in the abstract and hypothetical circumstances that this pre-enforcement facial challenge presents— would be a remarkable affront to the sovereignty, dignity and respect to which both the State and its judiciary are entitled under the Eleventh Amendment.

Importantly, that conclusion is not altered by Plaintiffs' suggestion that they could always raise a First Amendment defense in a disciplinary proceeding, whether the commentary says so or not.  Compl., ¶ 57.  Indeed, that is precisely the point.  In *Whole Woman's Health*, the Supreme Court made clear that there is no "unqualified right to pre-enforcement review of constitutional claims in federal court," and that those seeking to challenge the constitutionality of state laws are "not always able to pick and choose the timing and preferred forum for their arguments." *Whole Woman's Health*, 2021 U.S. LEXIS 6144 at *30.  It is therefore entirely appropriate to require litigants to raise their constitutional rights through any number of other avenues,

including most "typically as defenses to state-law claims" in state court.  *Id.* at \*29-30.  And when permitting pre-enforcement injunctive relief in federal court would violate the Eleventh Amendment, as it would here, requiring litigants to use those other forums is not only appropriate, it is constitutionally required.  *Id.*

**B.    Plaintiffs Have Not Sued Proper Parties For Purposes Of *Ex Parte Young***

In addition to the lack of an ongoing violation of federal law, the Eleventh Amendment bars this case for the additional reason that Plaintiffs have not sued proper parties for purposes of *Ex Parte Young*.

**1.    Judicial Decisionmakers Like Defendants Are Not Proper Parties Under *Ex Parte Young***

The SGC acts as an arm of the Superior Court.  Its members and staff are therefore judicial officers who exercise jurisdiction over judicial proceedings designed to resolve disputes about an attorney's compliance with the Rules of Professional Conduct.  The Supreme Court expressly held in *Whole Woman's Health* that such defendants cannot be sued under *Ex Parte Young*, and that holding is dispositive.

As noted above, the courts have long held that *Ex Parte Young* permits a suit to "prevent[] state ***executive*** officials from enforcing state laws that are contrary to federal law."  *Whole Woman's Health*, 2021 U.S. LEXIS 6144 at \*15 (emphasis added).  It does not, however, permit federal courts to issue "an injunction against a state court" or its "machinery," as to do so "would be a violation of the whole scheme of our Government."  *Id.*  The distinction lies in the nature of the function that each perform and their relationship to the private litigants before them.

17

Specifically, executive administrative agencies typically bring enforcement actions against private individuals and stand in an adversarial position when they do. *Id.* Executive agencies also operate under enabling legislation that typically does not permit—much less require—case-by-case assessments of whether a litigant's constitutional interests might be impacted if the statute is enforced. Instead, the agency's task is to simply apply state law as the statute commands, without regard to what constitutional concerns such enforcement might create. In such circumstances, it may be appropriate for federal courts to intervene under *Ex Parte Young* because doing so vindicates the supremacy of federal law without upsetting the principles embodied by the Eleventh Amendment. *Virginia Office for Prot. & Advocacy*, 563 U.S. at 256.

By contrast, state judges and other officials in the judicial "machinery" are not "adverse" to the parties before them and "do not enforce state laws as executive officials might." *Whole Woman's Health*, 2021 U.S. LEXIS 6144 at *15. They instead "work to resolve disputes between parties" and "to resolve controversies about a law's meaning or its conformance to the Federal and State Constitutions." *Id.* at *15-16. *Whole Woman's Health* expressly held that, if state courts err in those efforts, the proper remedy is "some form of appeal, . . . not the entry of an *ex ante* injunction preventing the state court from hearing cases" under *Ex Parte Young*. *Id.*[3]

---

[3]    It is not clear whether the Court in *Whole Woman's Health* intended the "adversity" part of this discussion in particular to be relevant to the Eleventh Amendment, standing under Article III, or both. To the extent it is the latter, Defendants incorporate this discussion by reference into their standing analysis below. *See infra* at 22-34.

*Whole Woman's Health* is dispositive here.  As discussed above, attorney discipline is a quintessential and exclusively judicial function performed by the state judiciary.  Although the courts have "delegated [part of their] exclusive and original authority" over such matters to the SGC and other disciplinary authorities, those officials "act as an arm of the court" and are thus "judicial entities" who exercise jurisdiction over "judicial proceedings" of the state courts themselves.  *Presnick*, 215 Conn. at 167; *Sobocinski*, 215 Conn. at 526; *Chester*, 1991 Conn. Super. LEXIS 1409 at *5-6.  Defendants do not bring or initiate those proceedings, and they do not stand in an adversarial position toward attorneys when a grievance complaint is filed.  Rather, like the judges and clerks in *Whole Woman's Health*, their sole function is to interpret and apply the Rules of Professional Conduct, to resolve complaints filed against attorneys, and to ensure that any discipline being imposed under the Rules complies with the First Amendment and other constitutional provisions.  As discussed above, this Court must assume that Defendants and other officials involved in the state judicial process can and will perform that constitutional gatekeeping function adequately.  *Burt*, 571 U.S. at 19.  And if for some reason they do not, Plaintiffs' proper remedy is "some form of appeal, . . . not the entry of an *ex ante* injunction preventing the state court from hearing cases" under *Ex Parte Young*. *Whole Woman's Health*, 2021 U.S. LEXIS 6144 at *15-16.

2. **Even If Defendants Were Executive Officials Who Could Be Sued Under *Ex Parte Young*, They Still Are Not Proper Defendants Because Plaintiffs Have Not Alleged That Defendants Have Both The Power And Willingness To Enforce The Rule In The Manner That Plaintiffs Fear**

Plaintiffs also have not sued the proper defendants with both the power and willingness to enforce the Rule in the manner that Plaintiffs fear. The Eleventh Amendment bars this case on that independent basis.

Specifically, "[t]o fall within the *Ex Parte Young* exception . . . the defendant state officer must have some connection with the enforcement of the act, or else [the plaintiff] is merely making him a party as a representative of the state, and thereby attempting to make the state a party.'" *HealthNow N.Y., Inc. v. New York,* 739 F. Supp. 2d 286, 294 (W.D.N.Y. 2010). To satisfy this requirement, the state officer must have both "a particular duty to enforce the statute in question ***and*** a demonstrated willingness to exercise that duty" based on the conduct before the Court. *Conn. Ass'n of Health Care Facilities, Inc. v. Rell*, No. 10-CV-136, 2010 U.S. Dist. LEXIS 54649, 2010 WL 2232693, at *5 (D. Conn. June 3, 2010) (emphasis added). Put differently, the *Young* "exception only applies when the named defendant state officials have some connection with the enforcement of the act ***and*** 'threaten and are about to commence proceedings' to enforce the unconstitutional act." *Okpalobi v. Foster,* 244 F.3d 405, 416 (5th Cir. 2001) (emphasis added). When that willingness to enforce is not present, it cannot be said that the official is "involved in an ongoing violation of federal law . . . ." *Goodspeed Airport, LLC v. East Haddam Inland Wetlands & Watercourses Comm'n,* 632 F. Supp. 2d 185, 188 (D. Conn. 2009).

20

Plaintiffs cannot meet either of those requirements.  First, Plaintiffs have not named the correct defendants with power to impose discipline under the Rule. Although Defendant Bowler is counsel to the SGC and has authority to dismiss grievances on certain grounds, *see* Conn. Prac. Bk. § 2-32(a)(2)(B), he does not have power to decide contested grievances or to impose discipline.  And although Defendant Berger is the Chairman of the SGC, he is just one voting member of that Committee and does not have unilateral authority to apply the Rule or impose discipline under it.  Such authority lies with the Committee members collectively, and it is only through them collectively that the Rule can be either applied or enjoined.

Second, even if Plaintiffs had named the correct defendants, there is no indication of a threatened enforcement action, imminent or otherwise, based on any protected speech that Plaintiffs purportedly wish to engage in.  Nor have Plaintiffs alleged a willingness on the part of these Defendants (or any other state actor) to apply the Rule to the extent an attorney's alleged conduct is constitutionally protected.  To the contrary, through this brief Defendants make clear that they do not believe the Rule applies to speech protected by the First Amendment and that they neither intend nor are willing to apply the Rule to such speech.  Given that, Plaintiffs' subjective belief that Defendants theoretically ***could*** apply the Rule to protected speech—no matter how unlikely such an application would be—is precisely the kind of "conjectural injury" that *Ex Parte Young* does not permit.  *HealthNow N.Y., Inc.,* 739 F. Supp. 2d at 295.

### C. *Pennhurst* Bars Plaintiffs' Claims That The Rule Violates The State Constitution

Even if Plaintiffs had alleged an ongoing violation of federal law and named proper defendants for purposes of *Ex Parte Young*, the Eleventh Amendment still bars Plaintiffs' claims in Counts 3 and 4.  In those Counts Plaintiffs allege violations of the Connecticut Constitution.  *See* Compl., Counts 3 and 4.  "[W]hen a plaintiff alleges that a state official has violated state law . . . the entire basis for the doctrine of *Young* . . . disappears" because "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law."  *Pennhurst State Sch.* & *Hosp. v. Halderman,* 465 U.S. 89, 106 (1984).  "On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment."  *Id.*; *see also Raygor v. Regents of Univ. of Minn.,* 534 U.S. 533, 541 (2002) (noting that "we cannot read § 1367(a) [the supplemental jurisdiction statute] to authorize district courts to exercise jurisdiction over claims against nonconsenting States").

## II.   PLAINTIFFS LACK STANDING

To the extent the Eleventh Amendment does not prohibit this Court from assuming the state courts' judicial function in grievances pending before them, Article III does.  That provision "limits federal courts' jurisdiction to certain 'Cases' and 'Controversies,'" which includes the requirement of standing.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013).  To establish standing Plaintiffs must allege

an injury that is (1) "concrete, particularized, and actual or imminent;" (2) "fairly traceable to the challenged action;" and (3) "redressable by a favorable ruling." *Id.* at 1147 (quotation marks omitted).

The first of these requirements is not satisfied here. In pre-enforcement challenges like this, to have standing litigants must allege that they intend to engage in specific conduct that the statute proscribes and that there is a sufficiently imminent risk of enforcement to justify federal court intervention. *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015). Although the imminence requirement may be "a somewhat elastic concept," the Supreme Court has made clear that "it cannot be stretched beyond its purpose . . . to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is ***certainly*** impending." *Id.* (emphasis in original), quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565 n.2 (1992). Even in the First Amendment context, therefore, "[a] party facing prospective injury has standing to sue [only] where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). "[A]llegations of ***possible*** future injury are not sufficient." *Clapper*, 133 S. Ct. at 1147. (emphasis in original; quotation marks omitted). Nor is an "objectively reasonable" fear of harm. *Id.* at 1147-50 and n.5. Rather, standing is established "only 'if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 300 (2d Cir. 2021), quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

In assessing whether future enforcement of a statute is sufficiently imminent to satisfy this requirement, particular "weight must be given to the lack of a history of enforcement of the challenged statute to like facts, that no enforcement has been threatened as to plaintiffs' proposed activities . . . [and that] the Government [has] disavow[ed] any intention to prosecute on the basis of the Government's own interpretation of the statute and its rejection of plaintiffs' interpretation . . . ." *Blum v. Holder*, 744 F.3d 790, 798 (1st Cir. 2014); *see Knife Rights, Inc.*, 802 F.3d at 384. Further, the imminence requirement generally is not met when future enforcement depends on hypothetical events that may never occur. *Clapper*, 133 S. Ct. at 1148-50. That is especially true when those events depend on the actions of independent third parties not before the Court, as the Supreme Court repeatedly has reiterated its longstanding "reluctan[ce] to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at 1149-50.

Applying these principles here, Plaintiffs have not established standing because they have not even sufficiently alleged what protected speech they personally wish to engage in. Even if Plaintiffs had made that threshold showing, moreover, they have and not cannot demonstrate a sufficiently imminent and likely threat of discipline based on constitutionally protected speech.

### A.   Plaintiffs Have Not Alleged Facts Demonstrating What Specific Protected Speech They Personally Wish to Engage In

As a threshold matter, Plaintiffs bear the burden to "point[] to specific facts" showing what protected speech they wish to engage in and that they believe the Rule proscribes. *Clapper*, 568 U.S. at 412 n.4. To satisfy this burden Plaintiffs "cannot

rely solely on conclusory allegations," and the Court is precluded from "draw[ing] inferences from the complaint favorable to plaintiffs." *Robinson v. Sessions*, 721 F. App'x 20, 23 n.3 (2d Cir. 2018), *cert. denied*, 138 S. Ct. 2584 (2018) (Summary Order).

Here, the only allegations about these Plaintiffs' own desired speech are abstract and conclusory assertions that Plaintiffs: (1) sometimes are "highly critical" and "criticize" viewpoints they do not agree with, Compl., ¶¶ 3, 15; (2) sometimes use "harsh language" or "forceful terms" when expressing their criticisms, *id.*, ¶¶ 14, 19, 52; (3) have opposed the Waterbury Board of Education's decision to teach critical race theory, *id.*, ¶¶ 18-19; and (4) their speeches "regularly address issues affecting several of the 15 groups protected by Rule 8.4(7)." *Id.*, ¶ 51. These are the epitome of conclusory allegations that are insufficient to survive a motion to dismiss.[4]

For example, it is unclear how Moynahan's intent to oppose the use of critical race theory in the Waterbury schools has anything to do with the Rule, which is limited to discrimination related to the practice of law and not during Board of Education meetings. Further, even if Plaintiffs' abstract suggestion that they wish to espouse their views "through legal blogs, articles in legal publications, continuing legal education (CLE) events [and] legal seminars" is enough to bring their speech within the "related to the practice of law" requirement, Plaintiffs have not alleged that their desired hypothetical speech meets the other requirements of the Rule.

---

[4]     The Complaint also contains conclusory allegations of speech by other individuals that Plaintiffs claim would fall within the scope of the Rule, *see* Compl., ¶ 54, as well as hypothetical speech that nobody has engaged in. *See id.*, ¶¶ 58. Because Plaintiffs do not allege that they personally have or will engage in such speech, these allegations are irrelevant to the standing analysis.

Specifically, the Rule does not prohibit "criticizing" other viewpoints or using "harsh language" in the abstract. *Id.*, ¶¶ 3, 14-15, 19, 52. Nor does it prohibit conduct merely because it "affect[s]" the protected categories. *Id.*, ¶ 51. The Rule applies much more narrowly to "conduct" that rises to the level of "discrimination" or "harassment." Those terms are intended to apply to conduct that is "directed at an individual" and that is so "harmful" and "severe or pervasive" and "derogatory or demeaning" that it rises to the level of a violation. *See supra* at 6-7. Further, conduct that implicates the protected categories will fall outside of the Rule if "there [is] a legitimate nondiscriminatory basis" for it. *Id.*

Given all of that, Plaintiffs' conclusory assertions that they wish to use "harsh language" to "criticize" other points of view through "speeches" at seminars and legal blogs does not even begin to demonstrate that their desired conduct would constitute discrimination or harassment under any understanding of those terms. Specifically, Plaintiffs do not suggest that they intend to target or direct their words to specific individuals, that their words will harm those unidentified individuals or be so pervasive, severe, derogatory and demeaning as to constitute harassment, or that they do not have legitimate nondiscriminatory reasons for their conduct. Plaintiffs' conclusory allegations are therefore insufficient to demonstrate even a potential injury for this Court to redress.

**B.     To The Extent Plaintiffs Have Alleged Specific Protected Speech They Wish to Engage In, The Rule Does Not Proscribe Such Speech And There Is Therefore No Credible Threat Of Enforcement Or Cognizable Chill On Speech**

Even assuming Plaintiffs had alleged the specific contours and circumstances of the speech they wish to engage in, they still would lack standing because the Rule simply does not apply to or proscribe activities that are legally protected by the First Amendment.  To the extent Plaintiffs wish to engage in such activities, therefore, there is no credible threat of enforcement and Plaintiffs cannot "manufacture standing" through a purported chill "based on their fears of [that] hypothetical future harm that is not certainly impending."  *Clapper*, 133 S. Ct. at 1151.

Specifically, in addition to the Rule's narrow application to "conduct" that rises to the level of "discrimination" or "harassment," the commentary makes clear that those terms do not apply to constitutionally protected speech.  *See supra* at 6-7.  The grievance procedures likewise require the disciplinary authorities to dismiss a grievance if the conduct is constitutionally protected.  *Id.* at 9-10.  Contrary to Plaintiffs' assertion, these protections are not "boilerplate" or "meaningless."  Compl., ¶ 57.  The latter protection imposes a binding obligation on the SGC and the state courts to conduct a constitutional review in every grievance before imposing discipline, and the former protection is an explicit rule of construction about how the Rule should be interpreted and applied.  Both protections "ma[ke] it clear that prosecutions under the [Rule] should not be brought against 'any expressive conduct . . . protected from legal prohibition by the First Amendment to the Constitution.'"  *Blum*, 744 F.3d at 801.  They are thus "a valuable indication of [the Judges'] concern

27

for the preservation of First Amendment rights in the specific context of the [Rule] in question," and "serve[] to validate a construction of the [Rule] which avoids its application to protected expression." *Committee in Solidarity with People of El Salvador* v. *FBI*, 770 F.2d 468, 474 (5th Cir. 1985); *see United States v. Johnson*, 875 F.3d 360, 367-68 (7th Cir. 2017); *United States v. Dillard*, 795 F.3d 1191, 1198 (10th Cir. 2015); *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998). They therefore preclude a finding that an adverse disciplinary action is certainly impending based on any protected speech that Plaintiffs wish to engage in.

*Clapper* and *Blum* are instructive. In *Clapper*, the plaintiffs brought a pre-enforcement First and Fourth Amendment challenge to a federal statute that allowed the government to surveil individuals outside of the United States. The statute expressly required that any surveillance under the statute must comply with the Fourth Amendment. 50 U.S.C. § 1881a(b)(6). Before any enforcement of the statute could occur, moreover, the government had to get approval for the surveillance from the Foreign Intelligence Surveillance Court ("FISC"), which approval required the FISC to affirmatively determine that the requested surveillance would not violate the Fourth Amendment. *Clapper*, 568 U.S. at 406, citing 50 U.S.C. § 1881a(i)(3)(A).

The Supreme Court held that the plaintiffs lacked standing because their fear of a future injury was too speculative and depended on a "highly attenuated chain of possibilities." *Id.* at 410. Central among them was the possibility that the judges on the FISC would authorize surveillance despite the "many safeguards" in the statute. *Id.* The Court made clear that this constitutional gatekeeping function performed by

28

the FISC was a "critical[]" factor in the standing analysis, and that federal courts should not "endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at 413-14; *see also id.* at 406 n.3 (chastising the dissent for minimizing the statute's safeguards, and in particular the gatekeeping function performed by the FISC).

The First Circuit reached a similar conclusion in *Blum*. As here and in *Clapper*, the statute in *Blum* contained a rule of construction making clear that "[n]othing in this section shall be construed (1) to prohibit any expressive conduct . . . protected from legal prohibition by the First Amendment to the Constitution . . . ." *Blum*, 744 F.3d at 795. Applying *Clapper*, the Court held that the plaintiff lacked standing because a future enforcement action cannot be certainly impending "when the challenged statute contains . . . explicit rules of construction protecting First Amendment rights, which in themselves would inhibit prosecution of First Amendment activities." *Id.* at 798, citing *Clapper*, 133 S. Ct. at 1145 n.3. In so holding, the Court rejected the same argument that Plaintiffs make here; namely, that "rules of construction cannot save an otherwise unlawful statute and so are irrelevant." *Id.* at 801; *see* Compl., ¶ 57. As the First Circuit aptly noted, for purposes of standing the focus is on legislative intent and the likelihood of a future enforcement action that conflicts with it. *Blum*, 744 F.3d at 801. The plaintiff thus lacked standing because there was "no reason" to think the government would "ignore these plain expressions of limiting intent" when interpreting and applying the statute, and the any subjective fear to the contrary was therefore "unreasonable." *Id.* at 801-02.

*Clapper* and *Blum* are dispositive.  Like the statutes in those cases, the Rule's commentary expressly provides that the Rule does not apply to First Amendment protected activities, and the Rule therefore requires the SGC and the state courts to affirmatively determine that an attorney's conduct is not constitutionally protected before a violation can be found or discipline imposed.  Further, by requiring both the SGC and the state courts to assess whether any potential discipline would violate an attorney's constitutional rights ***before*** discipline can be imposed, §§ 2-35(k)(1) and 2-38(f) require the state judiciary to perform the same constitutional gatekeeping function that the FISC performed in *Clapper*.  Given these express safeguards in both the Rule and the grievance procedures, there simply is no plausible argument that a disciplinary action under the Rule based on an attorney's constitutionally protected speech is certainly impending, much less that such an action actually could lead to the adverse disciplinary action that Plaintiffs supposedly fear.[5]

---

[5]     The commentary's reference to "verbal conduct" being within the scope of the Rule does not compel a different conclusion.  "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006).  The Supreme Court has thus made clear that "words can in some circumstances violate laws directed not against speech but against conduct"—including "sexually derogatory" words that show "sexual discrimination"—and that state laws prohibiting such conduct raise no First Amendment concern.  *R. A. V. v. St. Paul*, 505 U.S. 377, 389-90 (1992); *see also, e.g., Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018) (noting that "[m]ost antidiscrimination laws regulate[] membership and employment policies as conduct, not as expression," and that spoken words can violate such laws without raising First Amendment concerns); *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council, Inc.*, 968 F.2d 286, 295-96 (2d Cir. 1992) (similar).  Nevertheless, it undoubtedly is true that some spoken words properly can and will be characterized as protected speech, and not conduct, depending on their nature and the circumstances in which they are

Several other factors support and reinforce that conclusion. First, Plaintiffs do not allege that any person has ever complained about Plaintiffs' past or intended speech, indicated they felt discriminated against or harassed by that speech, or suggested that they wish to seek recourse against Plaintiffs for such speech. Even if such complaints had been made, moreover, there is no history of enforcement because the Rule has not even gone into effect yet. And there certainly is nothing to suggest that the SGC or the state courts intend, or have in any way threatened, to apply the Rule to First Amendment protected conduct in general, let alone to the kind of "criticisms" and "harsh words" that Plaintiffs abstractly reference. Given that the commentary and the grievance procedures prohibit such an application, it simply is not plausible for Plaintiffs to suggest there is a credible threat of discipline if Plaintiffs were to engage in legally protected speech that nobody has even complained about. *See Blum*, 744 F.3d at 793, 795-99.

Second, to the extent any possibility of discipline exists at all, it is based on a long string of hypothetical events that have not yet occurred and that likely never will. That includes: (1) Plaintiffs actually engaging in concrete and constitutionally protected speech in forums and circumstances that would be "related to the practice of law"; (2) an individual member of the public witnessing that speech and subjectively believing it violates the Rule; (3) that individual member of the public

---

spoken. For the reasons discussed herein, it is for the state courts to decide whether an attorney's actions in any given grievance are constitutionally protected speech that is excluded from the Rule or discriminatory conduct that properly is subject to discipline.

31

feeling strongly enough about the matter to take the step of filing a formal grievance complaint; (4) numerous judicial actors—including these Defendants, the local grievance panel and the reviewing committee of the SGC—all failing to heed the Rule's commentary and permitting the complaint to proceed; (5) the full SGC also ignoring the Rule's commentary and its independent obligation under § 2-35(k)(1) by imposing discipline based on constitutionally protected speech; and (6) the Connecticut Superior Court, Appellate Court and Supreme Court failing to perform their own judicial function to dismiss a grievance that is based on such protected activities.  It goes without saying that every step in this long string of hypothetical future events is far too speculative to support Article III standing, especially given the complete lack of facts alleged in the Complaint to suggest that any of these events are at all likely to occur.  *Clapper*, 133 S. Ct. at 1148-50.

That conclusion is buttressed by the fact that virtually all of these speculative future events depend on "guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at 1149-50.  Such guesswork makes it "'substantially more difficult'" for Plaintiffs to establish standing as it requires Plaintiffs to show "at the least" that the third parties not before the Court will "likely" and "predictably" take the feared action based on the conduct alleged.  *California v. Texas*, 141 S. Ct. 2104, 2117 (2021), quoting *Lujan*, 504 U. S. at 562, *Department of Commerce* v. *New York*, 139 S. Ct. 2551, 2566 (2019).  Plaintiffs have not even arguably met that burden for the reasons discussed herein.

Plaintiffs' reliance on *Greenberg v. Haggerty*, 491 F. Supp. 3d 12 (E.D. Pa. 2020) does not compel a different conclusion, as that case is readily distinguishable. *See* Compl., ¶ 66. As an initial matter, *Greenberg* did involve or discuss the Eleventh Amendment and is irrelevant on that basis alone. Unlike Connecticut's Rule, moreover, Pennsylvania's rule did not contain commentary or grievance procedures that expressly excluded protected First Amendment activities from the scope of the rule, and it did not require either the Pennsylvania disciplinary authorities or the Pennsylvania courts to dismiss grievances to the extent they are based on such activities. Both distinctions are critical to the standing analysis here for the reasons discussed above.

Further, Pennsylvania's Rule was far broader than Connecticut's and applied not just to discriminatory "conduct," but to all "words" that "manifest bias or prejudice." *Id.* at 23-25. The plaintiff also alleged "specific examples" of disciplinary actions that had been brought. *Id.* at 23, 24. That broader language and history of enforcement was critical to the *Greenberg* Court's analysis, as it plainly encompassed the plaintiff's intended actions. Given the lack of safeguards in the Pennsylvania rule, the district court held that the defendants could not avoid standing by simply "ask[ing] Plaintiff to trust them not to regulate and discipline his offensive speech even though they have given themselves the authority to do so." *Id.* at 24.

33

That is not this case.  Plaintiffs have neither alleged that they wish to engage in conduct proscribed by the Rule nor given "specific examples" of disciplinary actions that have been pursued based on an attorney's protected speech.  More importantly, Defendants do not ask Plaintiffs to just "trust them" not to discipline attorneys based on protected speech that Defendants "have given themselves the authority to" regulate.  *Id.* at 24.  To the contrary, both the Rule and the grievance procedures ***deprive*** Defendants of authority to discipline an attorney for engaging in protected speech.  This Court cannot find standing based on a hypothetical future injury that depends entirely on Defendants ignoring those limitations and exercising authority that they neither have nor intend to invoke.

## **CONCLUSION**

The Court should dismiss this case for lack of jurisdiction.

Respectfully submitted,

DEFENDANTS MICHAEL BOWLER
AND MATTHEW BERGER

WILLIAM TONG
ATTORNEY GENERAL

BY: */s/ Michael K. Skold*
Michael K. Skold (ct28407)
Emily A. Gait (ct31186)
Assistant Attorneys General
Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5020 (phone)
Michael.Skold@ct.gov
Emily.Gait@ct.gov

34

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2021, a copy of the foregoing was electronically filed. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_/s/  Michael K. Skold_
Michael K. Skold
Assistant Attorney General